620 P.2d 214

**In the Matter of a Member of the State Bar of Arizona, Richard A. NULLE, Respondent.**

**No. SB–184.**

Supreme Court of Arizona,
In Banc.

Nov. 12, 1980.

Michael J. Donovan, Phoenix, State Bar Counsel.

Filipe K. Johansson, Phoenix, for respondent.

GORDON, Justice:

Respondent, Richard A. Nulle, was charged with unethical conduct arising out of his dealings in the early months of 1976, with United Investments Diversified, Inc., (hereinafter UID) and its investors and stockholders.

After holding hearings with regard to the matter, State Bar Local Administrative Committee 5–L found that "[T]he Respondent Richard A. Nulle engaged in unprofessional and unethical conduct in violation of the Code of Professional Responsibility and of Rule 29(a) and (b), Rules of the Supreme Court, Canons 5 and 7 and Disciplinary Rules 5–101, Section (A), 5–104 Section (A) and 7–102, Section (A), subsection (3) thereof." The committee recommended that respondent be suspended from the practice of law for six months. The State Bar Disciplinary Board, following its own hearing and a review of the record, voted unanimously to affirm the local administrative committee's finding and recommendation. Upon respondent's objection to the Board's recommendation and in accordance with Rule 36(d), 17A A.R.S., Rules of the Supreme Court, this matter is now before us for consideration.

In a disciplinary proceeding against an attorney for professional misconduct, this Court is the trier of the ultimate facts as well as the law and must find clear and convincing evidence of unprofessional conduct before taking disciplinary action. *Matter of Weiner*, 120 Ariz. 349, 586 P.2d 194 (1978). Relying almost entirely on respondent's testimony in this matter, we find that the evidence clearly and convincingly establishes the following facts.

From November 1972 through at least April 1976, respondent represented Rare Earth Development Company, an entity whose two principal stockholders were James Wirth and Sam Nocifera. Respondent also formed Rare Earth Housing Corporation for Wirth, Nocifera and another individual and represented Rare Earth Housing Corporation from its inception through at least January, 1976.

In January, 1976, respondent was requested by James Wirth to draw up the legal documents necessary to purchase the stock of UID, the sole asset of which was, essentially, Reata Pass Restaurant. It was at first unclear who would purchase the UID stock, Rare Earth Housing Corporation or Wirth, Nocifera and other individuals. When it became evident that UID was to be purchased by individuals, respondent requested that he be allowed to participate in its ownership. His request, after receiving an initially negative reaction, was eventually granted. Respondent received a 5% interest in UID in exchange for foregoing legal fees for services in connection with the acquisition of UID and for services to UID after its acquisition.

We note in passing that, although not addressed by the local administrative committee or disciplinary board, such conduct is in direct conflict with Ethical Consideration 5–3: "A lawyer should not seek to persuade his client to permit him to invest in an undertaking of his client * * *." ABA Code of Professional Responsibility, EC 5–3.

UID was thereafter acquired by five people, James Wirth and Sam Nocifera, the principal shareholders, and Tony Nocifera, John Janssen and respondent, who held smaller interests. These five individuals, in an attempt to avoid anticipated adverse publicity, agreed that they would have Janssen act as their representative or "front" and that the corporation would be held in his name. Although the stock certificate of UID was endorsed in blank and delivered to respondent by the seller, Greer, the stock of UID was never reissued during the time with which we are concerned here.

■ A day or two after the purchase of UID, Janssen telephoned respondent as the corporation's attorney and inquired whether he should represent himself as the 100% stockholder of UID on an application for assignment of the UID corporation liquor license from Greer to himself as the new agent. A corporation applying for a liquor license is required by A.R.S. § 4–202(D) to reveal the names of all stockholders who own 10% or more of the corporation. Fail-

ure to disclose such stockholders is made a misdemeanor by A.R.S. § 4–246. The record indicates not only that Janssen was not a 100% stockholder, but that in fact James Wirth and Sam Nocifera each owned over 10% of the unissued stock. Nevertheless, respondent advised Janssen as president of UID to complete the liquor license application by representing himself to be the sole owner of UID. In so doing, since a corporation can act only through its agents, *Lois Grunow Memorial Clinic v. Davis*, 49 Ariz. 277, 66 P.2d 238 (1937), respondent effectively advised his client, UID, to file a false application in violation of A.R.S. § 4–202(D) and § 4–246.

We agree with the local administrative committee and disciplinary board that such advice violated Disciplinary Rule 7–102(A)(3). However, we find Disciplinary Rule 7–102(A)(7) even more on point: "In his representation of a client, a lawyer shall not * * * [c]ounsel or assist his client in conduct that the lawyer knows to be illegal or fraudulent." 17A, A.R.S., Rules of the Supreme Court, Rule 29(a). Further, respondent's advice was directly contrary to Ethical Consideration 7–5: "A lawyer should never encourage or aid his client to commit criminal acts * * *." ABA Code of Professional Responsibility EC 7–5.

Respondent has attempted to justify giving this advice by pointing out that at the time it was given, the five purchasers had a two–week option to transfer UID back to the seller, Greer, and that respondent told Janssen that the license would have to be revised after the stock ownership was certain. We are unclear as to how the possibility that the purchasers might require the seller to take back the corporation at some future time converts the ownership interests in the corporation from participation by five people to sole ownership by one of those five. In any event, respondent as UID's attorney made no future steps to rectify this erroneous advice after the expiration of the two–week option.

In connection with this acquisition of the UID stock respondent drew up a memorandum purchase/sale agreement, a manage-

ment agreement retaining the seller, Greer, as manager of the restaurant, and an option agreement enabling Greer to purchase within 24 months of February 2, 1976, sufficient shares to become a 50% owner of the corporation. Respondent states that he represented himself, the five purchasers, and the seller, Mr. Greer, in the preparation of this legal documentation. After the purchase was completed, respondent states he represented the corporation, UID.

At some point during February or March, the seller, Greer, quit his management duties at Reata Pass. About April 4 or 5, respondent suggested to Greer that he sell to respondent his option to buy 50% of the UID stock. Acquisition of this 50% when added to respondent's previous 5% would result in respondent owning 52½% or a controlling majority interest, of UID.[1] At no time did respondent advise the other four investors that he was interested in or attempting to purchase Greer's option. In fact, according to respondent's own testimony, he told Greer, "[Y]ou can go to them and say that you got an offer from me and if you do that, I'm not going to engage in a bidding war."

The record indicates that respondent anticipated that the other four investors would be upset about his acquisition of Greer's option. At the local administrative committee hearing, respondent admitted that, "I felt that there was a fair likelihood that Mr. Wirth and Mr. Nocifera would raise the issue of a conflict of interest." This belief that his former clients would be upset at his taking over control of the corporation which he had been hired to help them purchase is reflected in his handling of subsequent events as described below.

In the absence of any disclosure to Wirth, Janssen or the two Nociferas, respondent purchased Greer's option with an initial payment on April 5, 1976, and the balance on April 28, 1976. On April 29, he formed Cosmopolis Corporation, of which he owned

7% and a French citizen owned 93%. In exchange for his 7% interest, respondent transferred to Cosmopolis his 5% ownership in UID and Greer's option to purchase 50% of the outstanding stock of UID. On May 5, 1976, respondent drafted a letter to UID from Greer in which Greer purported to exercise his option, although he had at this point already disposed of it, and requested the shares be issued in the name of Richard A. Nulle (respondent) or his designee.

On Friday morning, May 7, respondent hand–delivered this letter to offices shared by Rare Earth Development Company, UID, James Wirth and Sam Nocifera. When Nocifera called him shortly thereafter as to the meaning of the letter, respondent was, in his own words, very evasive because he felt it would be necessary "to spend a half an hour to go into the details into the exact nature of the exercise" and he was due in court that morning.

It was not until Monday, May 10, that respondent finally disclosed to the investors in UID that, in his words, Cosmopolis had exercised the option and thereby owned 52½% of UID. Because the other UID investors indicated they would refuse to acknowledge the exercise of the option, respondent that same day drafted a complaint, which he filed the next day, in the Superior Court, in an attempt to force the other investors in UID to recognize Cosmopolis' controlling ownership.

The local administrative committee, as affirmed by the disciplinary board, found that respondent's conduct described above violated Canon 5 and Disciplinary Rules 5–101(A) and 5–104(A) of the Code of Professional Responsibility of the American Bar Association, adopted in an amended form by this Court in Rule 29(a), 17A A.R.S., Rules of the Supreme Court. We agree.

Respondent's principal argument in defense of his conduct is that at the time he purchased the option, he represented the corporation, UID, and not the individual

---

1. Exercise of the option would have diluted respondent's previous 5% stock interest by half, as well as diluting the stock interests of the other investors. Thus respondent after the

option exercise would have had 2½ stock ownership from his initial share plus 50% acquired from exercising the option, which amounts to 52½%.

stockholders. Therefore, since the corporation was, respondent believed, being poorly run, and because respondent intended to install better management, his taking over control of the corporation was in his client's best interest. We find this argument untenable.

The local administrative committee found that respondent represented James Wirth and Samuel Nocifera until May 10, 1976. Respondent claims that he represented Wirth and Nocifera only during the preparation of legal documents relative to their purchase of UID and that he represented UID and only UID after the purchase. Respondent cites *Corporation Comm'n v. Consolidated Stage Co.*, 63 Ariz. 257, 161 P.2d 110 (1945), for the proposition that a corporation is for most purposes an entity distinct from its individual members or stockholders. While this may be generally true, application of such a rule to the case at bar would require blinding ourselves to its realities.

The record before us discloses that for about four years before January of 1976 respondent had represented various corporations and business enterprises of Wirth and Nocifera and had represented each of those men in small personal matters. During the early months of 1976 up to May 10, respondent continued to represent Rare Earth Development Corporation, which was principally owned by Wirth and Nocifera. Respondent bargained with Wirth and Nocifera to be allowed to participate in the ownership of UID in exchange for providing legal services to UID without charge. The Oregon Supreme Court in considering a similar situation concluded:

"Where a small, closely held corporation is involved, and in the absence of a clear understanding with the corporate owners that the attorney represents solely the corporation and not their individual interests, it is improper for the attorney thereafter to represent a third party whose interests are adverse to those of the stockholders and which arise out of a transaction which the attorney handled for the corporation. In actuality, the attorney in such a situation represents the corporate owners in their individual capacities as well as the corporation unless other arrangements are clearly made." In re Brownstein, 288 Or. 83, 87, 602 P.2d 655, 657 (1979).

We find that under the circumstances of this case, respondent represented James Wirth and Sam Nocifera as well as UID and that such representation continued until terminated by Wirth and Nocifera on May 10, 1976.

Respondent further claims that he was prejudiced by the forgetfulness of witnesses caused by the delay of over two years between his attempted option exercise and the filing of a formal Bar complaint against him. The trial transcript covering the events out of which the complaint arose was marked in evidence at the local administrative committee hearings without objection as to its accuracy. This court can therefore use that transcript as evidence to support the committee's findings. Because the trial transcript is consistent with and reinforces the testimony presented in the hearings before the local administrative committee, we find no prejudice.

We have considered respondent's remaining challenges to the local administrative committee's findings and find them unpersuasive.

We feel compelled to add that we believe the ethical rules most seriously breached by respondent's conduct are Canon 4 and Disciplinary Rules 4–101(B)(2) and (3). Disciplinary Rule 4–101(B) provides in part: "[A] lawyer shall not knowingly * * * (2) Use a confidence or secret of his client to the disadvantage of the client [, or] (3) Use a confidence or secret of his client for the advantage of himself or of a third person, unless the client consents after full disclosure." 17A A.R.S., Rules of the Supreme Court, Rule 29(a), DR4–101(B)(2) and (3). Ethical Consideration 4–5 of the Code of Professional Responsibility, which may be used for interpretative guidance in applying the disciplinary rules, covers precisely the situation before us: "A lawyer should not use information acquired in the course of

the representation of a client to the disadvantage of the client and a lawyer should not use, except with the consent of his client after full disclosure, such information for his own purposes."

Respondent admits that he represented, among others, Wirth and Nocifera while preparing the documents used in the purchase of UID from Greer. During the course of such representation he learned about the financial composition of the business and the outstanding option held by Greer. This information he used both to his own advantage and to the disadvantage of his clients in acquiring and exercising Greer's option.

Even accepting, *arguendo*, respondent's contention that he represented UID and not the individual stockholders after the UID purchase was complete, his behavior is nonetheless unethical. A lawyer's obligation to preserve the confidences and secrets of his client continues after termination of the lawyer's employment. ABA Code of Professional Responsibility EC 4–6.

■ Respondent also challenges the level of discipline recommended by the local administrative committee and the disciplinary board. As we have said before, suspension is not imposed to punish an attorney. *Matter of Watson*, 118 Ariz. 70, 574 P.2d 1289 (1977). Rather, the purpose of discipline is to protect the public, the profession and the administration of justice, *Matter of Couser*, 122 Ariz. 500, 596 P.2d 26 (1979), and to deter other lawyers from temptation to violate their ethics, *Matter of Stout*, 122 Ariz. 503, 596 P.2d 29 (1979).

Respondent has directly violated three canons and five disciplinary rules of the Code of Professional Ethics. He has throughout these proceedings appeared to lack awareness of the fiduciary duties which he as an attorney owes to his clients. We feel obliged to respond to his behavior and general attitude with at least that discipline recommended by the committee and board.

It is therefore ordered that respondent, Richard A. Nulle, be suspended from the practice of law in this state for six months commencing upon the issuance of the mandate. It is further ordered that respondent pay costs in the sum of $1,535.92 pursuant to Rule 37(g), 17A A.R.S., Rules of the Supreme Court. Respondent is directed to comply with the provisions of Rule 37(h), 17A A.R.S., Rules of the Supreme Court.

STRUCKMEYER, C. J., HOLOHAN, V. C. J., and HAYS and CAMERON, JJ., concur.