652 P.2d 130

**In the Matter of a Member of the State Bar of Arizona, Paul W. MERCER, Respondent.**

**No. SB 183–2.**
**State Bar No. 79–3–5F.**

Supreme Court of Arizona,
In Banc.

Sept. 21, 1982.

Peter J. Rathwell, Phoenix, for petitioner.

Stephen D. Chaya, Phoenix, for respondent.

JACK G. MARKS, Superior Court Judge (Retired):

This matter was commenced on February 24, 1981, when a complaint was issued by the State Bar of Arizona Local Administrative Committee No. 5F to respondent Paul W. Mercer alleging four counts of professional misconduct. At the conclusion of the hearing held March 31, April 27 and 28, 1981, at which the respondent and his counsel appeared, Counts Two, Three and Four were dismissed.

Findings of Fact, Conclusions of Law and Recommendations were issued May 28, 1981, concerning Count One. Disbarment was recommended. The respondent filed objections August 5, 1981, and requested a hearing before the State Bar Disciplinary Board.

A hearing was held September 19, 1981, by the Disciplinary Board at which the respondent was represented by counsel. Mr. Mercer did not appear at this hearing. The decision of the Board affirmed the Committee's Findings of Fact and Conclusions of Law except as to an aspect of the Findings of Fact relating to a $17,500 "brokerage fee" or "legal fee" and Conclusions of Law numbered 4 and 5. The Committee's findings are summarized below.

Mercer developed a professional relationship with Robert E. Stock and his wife Anna in which Mercer performed "legal, business, accounting and tax reporting services." The Stocks decided to sell the Georgian Court Nursing Home, a piece of Phoenix property they owned. When the best offer a real estate broker could find was $195,000, Stock asked Mercer to help them sell the property.

Mercer was a general partner in L. & M. Investments. He arranged for his partnership to buy the nursing home. Mercer claimed to have fully disclosed his relationship with L. & M. Investments to the Stocks, but Stock testified that he presumed Mercer had some relationship with the partnership without being sure of the exact nature of the relationship.

The parties agreed to a sale for a price of $250,000. The down payment was $5,000 and annual payments of $50,000 were to be made until the full balance was paid. The agreement was embodied in a document entitled "Security Agreement" which was prepared by Mercer. Thus, Mercer represented both the sellers and the buyer. He testified that he advised Stock to seek independent counsel but believed Stock did not do so because L. & M. Investments' price far exceeded the next best offer.

The Local Administrative Committee found the Security Agreement to be "vague, ambiguous, and uncertain." Although Mercer testified that the agreement absolved the partners in L. & M. Investments of personal liability and allowed the partnership to unilaterally reduce its $50,-000 annual payment, the Committee found that the agreement did "not say this at all."

Upon sale of the nursing home, the Stocks found themselves in an unfavorable tax situation and turned to Mercer for assistance. To set up a deduction, Mercer created a $40,000 debt for legal fees owed to him by the Stocks. The Stocks "paid" the fee to Mercer who then "lent" the Stocks $40,000 evidenced by a promissory

note secured by a mortgage. The parties agreed that the $40,000 would be deducted from the final payment owed by L. & M. Investments for the purchase of the nursing home.

Within a few months thereafter, Mercer advised the Stocks to create a trust using as corpus the proceeds from the nursing home sale.[1] The Stocks agreed and Mercer drafted the necessary papers. The Local Administrative Committee found that the trust articles were "incompetently and unintelligibly drafted" and allowed Mercer to assume "irreconcilable conflicts of interest." For example, Mercer was named a trustor, a beneficiary, and the trustee and was authorized to exercise his judgment to "pay off all sums due to [himself as beneficiary] and to beneficiary L. & M. Investments."

The trust agreement also provided that the Stocks were to be paid only $24,000 annually despite the terms of the Security Agreement obligating L. & M. Investments to make $50,000 annual payments. Mercer testified that he believed the Security Agreement authorized him to unilaterally reduce the partnership's annual payments from $50,000 to $24,000. Stock apparently disagreed and since the trust was created during 1977 he has demanded, unsuccessfully, payment of $50,000 per year from L. & M. Investments which has continued to pay only $24,000 annually.

Mercer claimed to have made full disclosure of his position and interests to the Stocks before each of these transactions. The Local Administrative Committee doubted whether this was true but found in any case that full disclosure could not have avoided the "inescapable conflicts of interest" that Mercer "deliberately created" and did so "without any mitigating circumstances."

The Committee concluded that Mercer violated DR 5–104(A) and 5–105(A) and (B). DR 5–104(A) states:

"A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure."

DR 5–105 provides:

"(A) A lawyer shall decline proferred employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, except to the extent permitted under DR 5–105(C).

"(B) A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, except to the extent permitted under DR 5–105(C)."

If Mercer's prior suspension could be considered, see *In re Mercer,* 126 Ariz. 274, 614 P.2d 816 (1980), the three members of the Committee unanimously recommended disbarment.[2] The Disciplinary Board rejected the Committee's recommendation and voted six to three to recommend to this Court that Mercer be suspended from the practice of law for a period of two years. The dissenting three board members believed that a more severe penalty should have been recommended.

Pursuant to Ariz.R.S.Ct. 37(a), Mercer filed objections to the decision of the Disciplinary Board on October 26, 1981. Oral argument was heard June 10, 1982.

█ We approach this proceeding as the trier of facts and the law. *In re Kleindienst,* 132 Ariz. 95, 644 P.2d 249 (1982). Our supervisory power concerning the conduct of members of the State Bar is "to protect the public, the profession and the administration of justice and not to punish

---

1. One purpose of the trust appears to have been to "protect" the proceeds from a $70,000 judgment against the Stocks that had been or was about to be rendered in an unrelated lawsuit.

2. If the prior suspension could not be considered, two committee members recommended disbarment and one recommended a one-year suspension.

the offender." *In re Kastensmith,* 101 Ariz. 291, 294, 419 P.2d 75, 78 (1966). Furthermore, our purpose includes deterrence of "other lawyers from the temptation to violate their ethics." *In re Peterson,* 108 Ariz. 255, 257, 495 P.2d 851, 853 (1972). To justify discipline against an alleged offender, this Court must be satisfied by clear and convincing evidence, *In re Kleindienst, supra,* that the alleged offender has violated one or more of the Disciplinary Rules of the Code of Professional Responsibility, Ariz.R. S.Ct. 29(a).

In the American Bar Association Code of Professional Responsibility Preliminary Statement, the Disciplinary Rules were declared to be "mandatory in character. The Disciplinary Rules state the minimum level of conduct below which no lawyer can fall without being subject to disciplinary action." A.B.A.Code of Professional Responsibility and Code of Judicial Conduct at 1 (1976) (amended August, 1977).

We are satisfied that the evidence adduced before the Local Administrative Committee, as affirmed by the Disciplinary Board, fully supports the findings and conclusions, having met the test of clear and convincing evidence.

■ There can be no doubt that the interests of Mercer and the Stocks were differing as used in DR 5–104(A), *supra,* in accordance with the definition in our Code of Professional Responsibility as follows:

> " 'Differing interests' include every interest that will adversely affect either the judgment or the loyalty of a lawyer to a client, whether it be a conflicting, inconsistent, diverse, or other interest."

Ariz.R.S.Ct. 29(a), Definition (1).

Mercer admitted he drafted the Security Agreement and the Trust Agreement. Although he acknowledged that he was acting as Stocks' attorney when he prepared both agreements, examination of both documents reveals their terms were more for the protection of Mercer and L. & M. Investments than for the Stocks.

As trustee, Mercer did not carry out his duties toward his clients. Twenty-six thousand dollars per year was not paid by L. & M. Investments to the trustee during the first three years subsequent to the sale because L. & M. Investments "didn't have the money. The business was losing money. It—it isn't—it wasn't available to the trust," according to Mercer.

It is our opinion, in view of the way the sale of the nursing home developed, Mercer had a duty not to proceed with the sale until the Stocks had obtained independent legal advice. *Cf. Goldman v. Kane,* 3 Mass. App. 336, 329 N.E.2d 770 (1975).

■ DR 5–105(C) allows an attorney to represent multiple clients in situations covered by DRs 5–105(A) and (B) if he or she can obviously represent the interests of each client without compromising the exercise of his or her independent professional judgment and if each client consents to the representation after full disclosure of the situation. We have examined this case in light of DR 5–105(C) to determine if the exception for situations covered by DR 5–105(A) and (B) is applicable to this proceeding. It is our opinion that DR 5–105(C) is inapplicable because Mercer could not and did not exercise his independent professional judgment in behalf of his clients.

■ In disciplinary proceedings, an attorney objecting to the findings and recommendation of the Disciplinary Board has the burden "to show that they are not supported by the evidence or that they are erroneous or unlawful." *In re Haggard,* 123 Ariz. 27, 28, 597 P.2d 180, 181 (1979) (citations omitted). Mercer has failed to sustain his burden.

■ Paul W. Mercer was found by the Disciplinary Board to be guilty of unethical professional conduct with respect to his clients Robert B. Stock and Anna Stock concerning the Georgian Court Nursing Home transaction. The record of this proceeding mandates our affirmance of the decision of the Disciplinary Board.

The Disciplinary Board recommended that the respondent Paul W. Mercer be suspended from the practice of law for two years. Serious consideration has been given by this Court, as authorized by Ariz.R.S.Ct. 38(a)(4), to Mercer's prior suspension for a period of two months, *In re Mercer,* 126 Ariz. 274, 614 P.2d 816 (1980), and to the

395

recommendation of the Disciplinary Board and the findings and recommendation of the Local Administrative Committee. See *In re Lurie*, 113 Ariz. 95, 546 P.2d 1126 (1976). However, we alone have the authority to determine the discipline to be imposed although it be more severe than that which was recommended by the Disciplinary Board. *See In re Steward*, 96 Ariz. 49, 391 P.2d 911 (1964); *Heavey v. State Bar*, 17 Cal.3d 553, 131 Cal.Rptr. 406, 551 P.2d 1238 (1976). We hold that, because of the seriousness of the conduct of Mercer as well as his prior disciplinary proceeding, the recommendation of the Local Administrative Committee is more appropriate. *See In re Conduct of Gant*, 293 Or. 130, 645 P.2d 23 (1982).

It is, therefore, ordered that the respondent, Paul W. Mercer, be disbarred.

GORDON, V.C.J., and HAYS, CAMERON and FELDMAN, JJ., concur.

Note: Chief Justice WILLIAM A. HOLOHAN did not participate in the determination of this matter. The Honorable JACK G. MARKS, Retired Judge of the Superior Court of Pima County was assigned to assist this Court in the disposition of this matter.